STATE of Iowa, Appellee,

v.

Steven Scott FINDLING, Appellant.

No. 88–799.

Court of Appeals of Iowa.

Feb. 22, 1990.

As Corrected March 5, 1990.

Raymond E. Rogers, State Appellate Defender's Office, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Ann E. Brenden, Asst. Atty. Gen., Stephen E. Barbour, Webster County Atty., James J. Koll and Cynthia L. Goins, Asst. County Attys., for appellee.

Heard by OXBERGER, C.J., and DONIELSON and HAYDEN, JJ.

OXBERGER, Chief Judge.

Steven Scott Findling (Findling) appeals the judgment entered following his conviction by jury of murder in the first degree. Findling asserts that the trial court erred in: (1) overruling his motion for change of venue, (2) not suppressing a videotape of his statements made to Montana police; and (3) overruling his hearsay objection to his codefendant's testimony regarding what the victim told him. We affirm the decision of the district court in all respects.

In early January 1988 Steve Findling, Thomas Kitner, and Ray Carson spent time together in Mason City taking drugs. Findling told Kitner that he knew of a man in Fort Dodge who owned a large diamond ring, that it could be taken, but that murder might be involved. Findling stated that he planned to sell the ring in a diamond exchange in Chicago.

Findling and Kitner left Mason City and went to the home of Vernon White. Kitner had brought along a pair of rubber gloves and a pistol. The two men stayed at White's home for several hours and then left. Kitner then gave Findling his pistol. The two men subsequently returned to White's home, Findling claiming to have lost his wallet in White's basement. The three men went to the basement. Kitner began walking up the stairs and heard a shot. Kitner heard another shot and ran to the car.

Findling and Kitner then drove to Chicago to sell the ring. Findling subsequently found out that the stone in the ring was a fake. Several days later police searched Kitner's apartment and found the pistol.

Eleven days later, Findling was arrested at a rest stop in Montana after undersheriff George Ames spotted Findling's car and radioed in to check the license number. The dispatcher informed officer Ames that Findling was wanted for first-degree murder. Findling was subsequently arrested and taken into custody. At headquarters the officer then conducted a videotaped interview wherein Findling stated that he knew about parts of the murder, was familiar with White and Kitner, but that he was not guilty of the crime. He stated he had

no idea where the ring was. Findling was subsequently returned to Iowa.

The trial court denied Findling's pretrial motion for change of venue based on pretrial publicity. The case was subsequently submitted to the jury which returned a verdict of guilty. Before judgment and sentencing were entered, Findling filed a motion for new trial and a motion for arrest of judgment based on numerous grounds of evidence inadmissibility and improper venue. The trial court denied both motions. Findling has appealed.

## I. *Change of Venue*

First, Findling contends the district court erred in overruling his motion for a change of venue. Findling's venue claim is based on pretrial publicity. He urges that because of pervasive and inflammatory media coverage in Webster County the district court should have granted him a change of venue. Findling claims that as a result of such coverage it was impossible for him to receive a fair trial.

Iowa Rule of Criminal Procedure 10(10)(b) provides that a court shall grant a change of venue where the evidence demonstrates that "such degree of prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county...." In seeking a reversal of a conviction based on the denial of a change of venue, the defendant must show " 'either actual prejudice on the part of the jury or ... that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed.' " *State v. Harris,* 436 N.W.2d 364, 367 (Iowa 1989) (citing *State v. Spargo,* 364 N.W.2d 203, 207 (Iowa 1985)). Upon our de novo review of the record, we will not overturn a trial court's decision rejecting a motion for change of venue unless we find an abuse of discretion. *Harris,* 436 N.W.2d at 367; *State v. Wilson,* 406 N.W.2d 442, 445 (Iowa 1987).

In this case the pretrial publicity consisted of numerous newspaper articles and radio broadcasts. The publicity was extensive and it thoroughly covered the pretrial proceedings. Findling claims that the media coverage showing the victim, Vernon White, as a member of the community who was "widely known, highly respected, and well liked," along with repeated reports of Findling's criminal history was inflammatory pretrial publicity.

We note that media accounts which are "factual and informative in tone do not support a claim that they must be presumed to have created prejudice against a defendant." *Wilson,* 406 N.W.2d at 445. Upon our review of the record we believe the newspaper articles and radio broadcasts were largely factual in tone and contained no view on Findling's guilt or innocence. Further, we do not find the media coverage to be inflammatory.

Our review of the record reveals three nonfactual reports among the newspaper articles. These articles consisted of two editorials and one letter to the editor. Two of these articles amounted to tributes to the victim. The third article commended the law enforcement officials for their expeditious conclusion of the case. Specifically the article stated, "alert police and DCI work so quickly solving the heinous crime merits praise for our local and state law enforcement authorities." We believe these nonfactual articles do not rise to the level of pervasive and inflammatory publicity that would deny Findling a fair trial. *See Wilson,* 406 N.W.2d at 445. (Media report of sheriff's statement jail escapee Wilson was "one of the most dangerous inmates we've had here" not cause for change of venue in trial for crime unrelated to escape). *Cf. State v. Robinson,* 389 N.W.2d 401, 403 (Iowa 1986) (county saturated with media reports strongly suggesting defendant's involvement in attempted murder with which he was charged; held, trial court abused its discretion in denying motion for change of venue).

Findling also suggests that the juror responses during voir dire demonstrated the pervasive and inflammatory media coverage that denied him a fair trial. During jury selection, only two of forty-seven prospective jurors and alternates stated

they were unfamiliar with the case. We note that familiarity or "[e]xposure to newsworthy events will not give rise to presumption of prejudice." *State v. Wagner*, 410 N.W.2d 207, 222 (Iowa 1987). Juror impartiality does not mean complete juror ignorance of issues and events. *State v. Gavin*, 360 N.W.2d 817, 819 (Iowa 1985). Additionally, a community's knowledge of a defendant's prior criminal history does not entitle him to a change of venue. *State v. Spargo*, 364 N.W.2d 203, 207 (Iowa 1985); *State v. Shipley*, 429 N.W.2d 567, 571 (Iowa App.1988).

"The crucial determination is whether, as a result of pretrial publicity or for other reasons, a substantial number of prospective jurors hold such fixed opinions on the merits of the case that they cannot impartially judge the issues to be determined at trial." *Harris*, 436 N.W.2d at 367. The reported voir dire questioning in the present case fails to indicate that this type of pervasive prejudice existed so as to poison the available pool of jurors. In consideration of all the factors set out above and based upon our independent evaluation of the record, we conclude the district court did not abuse its discretion in overruling the defendant's motion for change of venue. Findling failed to show that such degree of prejudice existed in Webster County that he could not receive a fair and impartial trial.

## II. *Motion to Suppress*

Next, Findling asserts the district court erred in admitting his videotaped statements into evidence in violation of the state and federal constitutions. He suggests that since he had not formally signed a waiver of his *Miranda* rights and was interrogated after he told the assistant sheriff he didn't want to say anything incriminating the videotaped statement should not have been admitted into evidence.

Findling claims that the statement should not have been admitted because it was obtained in violation of Article I, Section 10 of the Iowa Constitution which provides "[i]n all criminal prosecutions ... the accused shall have a right ... to have the assistance of counsel." Since the issues raised are constitutional questions, our review is de novo. *State v. Newsom*, 414 N.W.2d 354, 357 (Iowa 1987).

In analyzing Findling's assistance of counsel claim we engage in a two-part inquiry. We first determine whether the right to counsel had attached at the time of the statement. Next, we determine whether the defendant effectively waived that right. *State v. Jackson*, 380 N.W.2d 420, 421 (Iowa 1986). The State concedes that Findling's right to counsel had attached when he gave his statement. The dispute lies in whether Findling effectively waived his right to counsel under the Iowa Constitution.

Findling does not claim the admission of the videotaped statement violated his sixth amendment right to counsel. He concedes that the *Miranda* waiver also constituted a waiver of his sixth amendment right to counsel as the United States Supreme Court held in *Patterson v. Illinois*, 487 U.S. 285, 288–90, 108 S.Ct. 2389, 2393, 101 L.Ed.2d 261, 271–77 (1988). Findling, however, contends that a mere waiver of the *Miranda* rights is insufficient to waive his right to assistance of counsel under Article I, Section 10 of the Iowa Constitution. The State contends that there should not be a different standard applied to Findling's state constitutional claim than recognized as applicable to his federal constitutional right.

In our analysis of a defendant's right to counsel under the Iowa Constitution we rely on our own interpretation to broadly construe the right to effectuate its purpose. *State v. Newsom*, 414 N.W.2d 354, 359 (Iowa 1987). "The Supreme Court of Iowa is the final arbiter of the meaning of the Iowa Constitution, but when the federal and state constitutions contain similar provisions, they are usually deemed to be identical in scope, import, and purpose." *State v. Davis*, 304 N.W.2d 432, 435 (Iowa 1981). Consequently, we give special respect and deference to the United States Supreme Court's interpretations of similar language in the federal constitution. *Id.*

The State asserts that the rationale and ruling of the United States Supreme Court

in *Patterson v. Illinois* should be adopted in our analysis of Findling's state constitutional claim. We agree. As previously noted, in *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988), the United States Supreme Court held that a defendant's waiver of *Miranda* rights is sufficient to waive his sixth amendment right to counsel. *Id.*, 487 U.S. at 296, 108 S.Ct. at 2397, 101 L.Ed.2d at 275. The key inquiry is whether the defendant was made sufficiently aware of his right to have counsel present and of the possible consequences of a decision to proceed without advice. *Id.*, 487 U.S. at 292, 108 S.Ct. at 2395, 101 L.Ed.2d at 272. We find this inquiry consistent with the Iowa Supreme Court's analysis in *State v. Jackson*, 380 N.W.2d 420 (Iowa 1986).

In *Jackson*, the Iowa Supreme Court noted that the State must meet a heavy burden to prove a defendant waived the right to counsel. *Jackson*, 380 N.W.2d at 424. In order for the State to meet its burden, "[t]he State must prove by a preponderance of the evidence that the defendant (1) understood the right and (2) intentionally relinquished it." *Id.* In *Patterson*, the United States Supreme Court concluded that by giving the defendant the *Miranda* warning the defendant was sufficiently aware of the "sum and substance of the rights that the Sixth Amendment provided . . . ." *Patterson*, 487 U.S. at 293, 108 S.Ct. at 2395, 101 L.Ed.2d at 273. The Court further noted there was little else defendants could possibly be told to make them aware of their right to have counsel present. *Id.* We find this analysis to be equally applicable to Findling's state constitutional claim.

Findling was read his *Miranda* rights on two separate occasions prior to giving the statement. Furthermore, Findling is not a stranger to the criminal justice process. Findling was previously arrested and charged with first degree robbery and possession of an offensive weapon. There was no indication Findling was subjected to either physical mistreatment or prolonged interrogation. We believe the *Miranda* warning sufficiently informed Findling of his right to counsel under the state constitution.

The *Patterson* Court also found that the *Miranda* warning sufficiently informed defendants of the consequences of their decision to waive their sixth amendment rights. *Id.*, 487 U.S. at 292–96, 108 S.Ct. at 2395–96, 101 L.Ed.2d at 273. The Court noted that the ultimate adverse consequence of defendant's decision to make uncounseled statements was that they would be used against him in subsequent criminal proceedings. *Id.*, 487 U.S. at 292, 108 S.Ct. at 2395, 101 L.Ed.2d at 273. The Court concluded that the *Miranda* warning made the defendant aware of those consequences. We also believe this analysis applies equally to Findling's state constitutional claim. The *Miranda* warnings read to Findling informed him of the consequences of his statement. We find that Findling fully understood his rights and knowingly, voluntarily and intelligently waived them in agreeing to give a statement to officer Ames.

■ Findling next claims his fifth amendment rights were violated when officer Ames continued to interrogate him after he clearly and unambiguously invoked his right against self-incrimination and his right to remain silent. Findling's videotaped interview began at 1:20 a.m. After the interview proceeded for a few minutes the following conversation occurred between officer Ames and Findling:

[OFFICER]: Which brings us to the seventeenth. OK. At the end of three days, what did you do Steven?

[DEFENDANT]: Left. I, I don't know. Like, I don't want to say anything that's going to incriminate me in any way. I don't . . . like I said, I don't know the exact times of everything, I mean this is really big shit here . . . I mean, I don't know what to . . . what to think . . . what . . . I, I don't know.

[OFFICER]: Well, you say you don't want to say anything to incriminate yourself . . . remember now, I did read you your Miranda rights.

[DEFENDANT]: Yeah, I know.

[OFFICER]: And you have that right. OK. You, ah, you can't remember when, when you left or you'd rather not tell me when you left?

Findling asserts that this statement is a clear and unambiguous invocation of his fifth amendment right to counsel.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V.

In denying Findling's motion to suppress the statement the district court stated:

> After reviewing the transcript and the video tape, the Court concludes that Defendant's statement was not an attempt to assert his Miranda rights. First, his statement comes in the middle of a four sentence answer to a question. The Defendant makes the statement about not wishing to incriminate himself, and continues with the answer. This gives credence to the State's position that he was simply expressing his wish not to incriminate himself because of his uncertainty as to times and dates. Second, after Officer Ames reminds the Defendant that he was read his Miranda rights and that he still has those rights, the Defendant continues with the interview. Thus, the Defendant was given two opportunities to clarify his statement, and stop the interview, if that was his desire. Finally, the Court notes that the Defendant demonstrated his knowledge of his rights, and his ability to invoke them, subsequently in the interview. Therefore, the Court concludes that the Defendant's statement was not an assertion of his Miranda rights.

We agree with the analysis of the district court.

The State contends Findling's statement cannot be divorced from its context since Findling did not stop after making the statement in question but continued on, uninterrupted, to attempt to answer officer Ames' question. We agree. Upon our examination of the whole record and consideration of the totality of the circumstances we find the district court correctly concluded that Findling's statement was not an invocation of his fifth amendment rights against self-incrimination.

Findling also claims that officer Ames gave him a promise of leniency by the following statement:

> Now's the time to help yourself. Not six months down the road. So, if you've got something to tell me, I don't want anything that isn't the truth, and I don't want you to tell me that you did something if you didn't do it, but I would like you to give me the truth. So if you want to tell me your story, now is the time to do it.

We find this contention without merit. "An officer can ordinarily tell a suspect that it is better to tell the truth. The line between admissibility and exclusion seems to be crossed, however, if the officer also tells the suspect what advantage is to be gained or is likely from making a confession." *State v. Hodges*, 326 N.W.2d 345, 349 (Iowa 1982). Officer Ames at no time told Findling he would gain some advantage by making a confession. We hold that the statement was voluntarily given because it was not induced by a promise of leniency.

Consequently, we find no error by the district court in denying Findling's motion to suppress his pretrial statement.

### III. *Hearsay*

Finally, Findling claims that the trial court erred in overruling his hearsay objection to Kitner's testimony about what White told him while in the house. He contends the State's sole purpose in offering Kitner's testimony was to prove the truth of the matters asserted in the statements and thus to prove he was at the scene of the murder.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Iowa R.Evid. 801(c). "Hearsay is not admissible except as provided by the Constitution of the state of Iowa, by statute, by these rules, or by other rules of the Iowa Supreme Court." Iowa R.Evid. 802.

In order to determine whether this evidence is hearsay we must determine the "real" purpose for which this evidence was offered. *State v. Hollins,* 397 N.W.2d 701, 705 (Iowa 1986). This determination is made by reviewing the record to determine if the purpose asserted by the State can reasonably be found to be the real purpose for which the challenged testimony was offered. *Id.* If the offered evidence is "deemed relevant and otherwise admissible for the purpose for which it supposedly was offered, then that purpose is supported objectively in the record and will be accepted." *Id.* at 706.

The State asserts the statements in controversy were offered not for the truth but rather to show the relationship between Findling, Kitner and the victim, Vernon White. The State sought to draw the inference that Findling, a friend of Mr. White's, was present as well as Kitner. The State contends the statements made by Mr. White support the inference that he was speaking to someone other than a total stranger.

Findling asserts that since the State offered independent proof through testimony of White's friends and acquaintances that Kitner's testimony was in fact true, the State's real purpose for offering Kitner's testimony was to prove the truth of the matters asserted therein. We disagree. Upon our review of the record we find the independent evidence, through testimony of White's friends and acquaintances, corroborated the fact that the statements were made by Mr. White. We conclude that Kitner's testimony concerning statements made by Mr. White was relevant and was not offered to prove their truth but to establish the relationship between the parties. Therefore, we find no error by the district court in overruling Findling's hearsay objections to Kitner's testimony regarding what Mr. White told him.

## IV. *Conclusion*

In summary, we find no abuse of discretion on the part of the district court in overruling Findling's motion for change of venue. We find no error by the district court in denying Findling's motion to suppress his pretrial statement. We also find no error by the district court in overruling Findling's hearsay objection to Kitner's testimony. We affirm the decision of the district court in all respects.

AFFIRMED.

HABHAB, J., takes no part.